J. P. ANDERSON CO. v. GOLD MEDAL
CANDY CORP.

Civil Action No. 9281.

United States District Court
E. D. New York.

Nov. 20, 1950.

910

Gallop, Climenko & Gould, New York City (George Trosk, New York City, of counsel), for plaintiff.

Grace & Grace, Brooklyn, N. Y. (Patrick J. Grace, Jr., Brooklyn, N. Y., of counsel), for defendant.

BYERS, District Judge.

The plaintiff seeks judgment for the unpaid balance of $3,139.00, its charges for building and delivering a candy-cutting machine to the defendant. The latter asserts a counterclaim for breach of implied warranty of fitness in the amount paid on account ($5,683.00), and by amendment at the trial, the Statute of Frauds as a defense. By similar action, the answer was amended to deny acceptance of the machine which was alleged in the complaint.

There are no conflicting versions of fact to be resolved, since the testimony is undisputed as to all matters essential to decision; thus itemized findings are not required.

Jurisdiction of the cause and the parties rests upon diversity of citizenship, and the amount in controversy. The plaintiff is a corporation of Pennsylvania having its principal office in Philadelphia, and the defendant is a New York corporation of this District.

The controversy involves a machine for cutting candy, made by the plaintiff for the defendant as the result of an inquiry by the latter based upon its use of a cutting machine of the plaintiff's make at an earlier day, which the defendant acquired some years ago from some one other than the plaintiff. That was not then a new machine, having been reconditioned for defendant's use, so that nothing can be predicated of it, for present purposes, save that it served as a directory to the plaintiff's plant.

In October of 1946, the defendant first employed one Hutchinson as plant superintendent, whose idea it was that a cutting machine could be built employing a continuous cutter called a guillotine knife, which should move in step with the belt carrying the candy, and cut the latter without loss of motion during the operation of the conveyor belt. He said he had seen such a machine in operation in Chicago, and explained his ideas to a Mr. Day, then the engineer in charge of operations of the plaintiff's plant. Thus the present relationship of the parties was initiated.

The critical issue is whether the plaintiff undertook to provide a machine which would function according to the then stated purposes of the defendant, or whether it accepted from defendant, Hutchinson's theories of design, and undertook to embody them in this machine, without, however, assuming responsibility for the efficacy of his mechanical concepts.

Direct evidence to support a conclusive answer to the question is less than profuse. It is to be gathered from correspondence, and all that appears from the testimony of Bonomo, president of defendant, and Jontza, its maintenance engineer during the pertinent period, and Monheit, Jr., employed by plaintiff, but called by defendant, all of whom related incidents constituting the unwritten history of the relationship of the parties between October of 1946 and April of 1948 when the dispute may be deemed to have become irreconcilable.

Hutchinson is no longer in the defendant's employ, but when he ceased to be has not been stated. He did leave an address, also not stated, where Bonomo says he got word at an undisclosed time, that Hutchinson was traveling "around the country somewhere and they did not know where he was".

That is an unconvincing showing that any serious effort was made to procure Hutchinson's testimony; the deduction is permissible that defendant was content to go to trial without calling him as a witness.

Day, the plaintiff's engineer and formerly in control of its operations, died in 1948, prior to the date of the filing of the answer on September 20, 1948. Monheit, the president, died on the 28th day of that month.

Under these circumstances, all available testimony was received, much of it over objection, in an effort to gain an understanding of the entire situation which was created with the informality which usually characterizes ordinary business relationships, even though such meeting of the minds as may be deemed to have been established is reflected in a letter from plaintiff to defendant, dated December 6, 1946, which contains the proposal made by the plaintiff (Ex. 1) and defendant's order dated April 15, 1947 (Ex. 6).

The former is too long to quote, but will be seen to state the proposal "to supply all material and labor to build a unit consisting of the following parts", namely,

*One 8 ft. conveyor* equipped as stated;

*One circular knife cutter* equipped as stated;

*One 10 ft. conveyor* equipped as stated;

*"One guillotine knife cutter,* with the knife having a stroke of 3", operating in a vertical motion at a rate of 60 strokes per minute. In conjunction with the vertical motion of the knife, the knife assembly would have a horizontal motion of approximately one inch per stroke, so timed that the knife would travel forward slightly faster than the candy, while the candy is being cut. It would also include two triangular knife scrapers, spaced one half inch apart, to support the candy during the final part of the cut by the guillotine knife. This cutter would be supplied with a flywheel to counterbalance the eccentric motion of the cutting head, and would accommodate any width of candy up to 40" wide. It would be operated by approximately a 3 H.P. motor, speed reducer and 'V' belt drive."

The remaining portion of the letter has to do with the assembly of the unit at either plant, shortage of materials, and the contemplated adaptation, if necessary, of elements supplied from exterior sources; delivery date, and possible readjustment of price as estimated.

The quoted reference to the guillotine knife is the only basis to support an assertion concerning its performance, namely, that in conjunction with its vertical motion, the knife assembly would have a certain horizontal motion "so timed that the knife would travel forward slightly faster than the candy, while the candy is being cut".

There is no testimony that the unit was not built so as to function in the manner stated, or to embody all other elements prescribed in Ex. 1.

In his deposition before trial, Bonomo testified: "It was rejected only because it did not do the job it was intended for."

The order was placed as related above, on April 15, 1947 (Ex. 5) in a letter written by defendant which opens as follows: "We are ready to proceed with the building of the special two way cutting machine you are to build *to specifications submitted by our company*. Your estimated cost * * *." (Italics supplied.) The balance of the letter is consistent with defendant's supervision over design, for even completed drawings are to be discussed with Hutchinson (who signed the letter), and with the understanding that this machine was "special equipment".

The later correspondence in evidence, and the testimony of the defendant's witnesses, do not establish any modification of the contractual relationship of the parties so disclosed.

Exhibit G (defendant's letter of March 30, 1948) has not been overlooked but it cannot be accorded evidentiary import contemporaneous with the contract or its performance, since defendant requested delivery of the machine knowing of its fallibility, on December 18, 1947. On this subject Bonomo testified: "* * * At that time I suggested to Mr. Day that they deliver the machine to our plant for further tests * * *, and it would be better to eliminate the bugs over at our plant rather than at their plant where they only had small pieces of candy."

That colloquially expressed expectation was consistent with the defendant's undertaking to provide specifications (See Ex. C, a sketch signed by Hutchinson while the work was going forward).

It is to be understood that this machine was a specially constructed unit intended to embody defendant's ideas as to how a desired result could be achieved, not a stock model of plaintiff's own design. Indeed, in December of 1946 and for some time prior, the plaintiff had not made and was not selling candy-cutting machines, but machines to dice vegetables for the canning industry, and equipment to produce cocoanut shreds.

It is with such an understanding of plaintiff's business in December of 1946, that defendant's version of the initial undertaking is to be appraised, thus Bonomo: "* * * He (Hutchinson) said that he saw the machine in operation with these traveling knives, and he suggested we adopt the same thing. And I asked Mr. Day if it could be done, and he said 'Yes I guess it can, with the help here of Mr. Hutchinson. If he saw it I think we can do it.' * * *."

Obviously this means that it was Hutchinson's capacity to have accurately discovered the mechanical functions that he said he had observed, and his ability to impart that information to Day, which elicited the opinion upon which the defendant now relies to shift from *its own* specifications to Day's expression of a guess or belief, an undertaking which it characterizes as a warranty and guaranty "that the machine, as constructed, would fulfill the intended purpose of the same" (Answer, paragraph 2 of Defense and Counterclaim).

The proof does not sustain that allegation.

Concededly there was no written warranty or guaranty, and from what has been written it will be seen that Section 96 of Article 5 of the Personal Property Law of New York, McK.Consol.Laws, c. 41, by its plain terms, excludes the existence of an implied warranty, thus: "Subject to the provisions of this article and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"1. Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, *and it appears that the buyer relies on the seller's skill or judgment* (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose." (Italics supplied.)

Here the buyer is shown not to have relied upon anything but the seller's undertaking to turn out a machine according

to the buyer's specifications; and there is no proof of failure to do that, as to workmanship or materials. The quoted testimony of Bonomo is that the right to reject was based on failure to perform, not on failure to provide a machine according to the buyer's specifications.

As to the buyer's apparent direction of design and arrangement, Exhibits 11, 12, 13, and 22 contain uncontradicted versions of attendance by defendant's representatives at plaintiff's plant, and the giving of instructions and directions.

It has been assumed that the law of New York governs as that was the place of delivery (at buyer's expense), but under the statute above quoted, no implied warranty has been established, and the counterclaim fails.

It is not without significance that the defendant offered no evidence as to the difference in value of the unit as allegedly contracted for, and as delivered.

The cases cited to sustain the claim of implied warranty are wide of the facts disclosed in this record. Hoisting Engine Sales Company v. Hart, 237 N.Y. 30, 142 N.E. 342, 31 A.L.R. 536, however, contains a helpful discussion of this branch of the law.

The defense based upon the Statute of Frauds is but vaguely hinted at in the defendant's brief. No reference is made to that portion of the Statute, Personal Property Law, Section 85, Subdivision 2, which reads: " * * * but if the goods are to be manufactured by the seller especially for the buyer and are not suitable for sale to others in the ordinary course of the seller's business, the provisions of this section shall not apply." As to the purpose of the foregoing, see Indiana Limestone Co. of New York v. Harry Bernstein Cut Stone Co., 263 App.Div. 312, 32 N.Y. S.2d 956; as to its applicability, see Exhibit 5.

If this were not enough, Exhibits 1 and 5, taken together, constitute a compliance with Subdivision 1 of that Section, coupled with the payments on account to which reference has been made.

This defense has not been established.

It results that the plaintiff is entitled to recover judgment against the defendant for the sum demanded in the complaint, namely, $3,139.00, with interest from December 17, 1947, and costs to be taxed. Let judgment be entered accordingly.